UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **NICOLE RUDDY,** | 2:18-CV-12972-TGB-DRG |
| Plaintiff, | |
| vs. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **ONLINE TECH LLC,** | |
| Defendant. | |

Plaintiff Nicole Ruddy sued her employer, Online Tech LLC ("OLT"), for alleged violations of federal and state disability and employment discrimination laws. For the reasons that follow, OLT's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.** Additionally, Defendant's Motion in Limine and Motion for Leave to File for Partial Summary Judgment are **DENIED**. Plaintiff's Motion to Strike is **DENIED** as moot.

## I.    BACKGROUND

Nicole Ruddy started working at OLT in March 2016 in a sales role. She was recruited to be a "hunter"—she was supposed to develop new potential customers for OLT's business. Ruddy Dep. 12:18-20, ECF No. 42-2, PageID.2783.

In April 2017, she was diagnosed with Behcet's disease. *Id.* at 24:17-23, PageID.2786. This chronic illness caused her ulcers, nausea, diarrhea, and other symptoms whenever she was having flare-ups. *Id.* at 25:5-13, PageID.2787. After her diagnosis, she contacted Deborah Webster in OLT's human resources department to seek out accommodations in the workplace. They developed a plan regarding accommodations that was memorialized in a letter dated April 26, 2017, which both Plaintiff and Webster signed. *Id.* at PageID.2788. The offered accommodations included time off for medical treatment and the ability to attend Monday internal sales team meetings from home. Def.'s Ex. 2, ECF No. 30-3. The accommodations were offered "through Monday, May 15, 2017," and Ruddy was instructed to "keep [OLT] up to date on your medical condition and advise [OLT] if you desire any further accommodation." *Id.*

Ruddy alleges that beginning in the fall of 2017, OLT employees and supervisors became increasingly hostile regarding the provision of her accommodations. In October 2017, she was put on what the parties call either a "training plan" (according to Defendant) or a "performance plan" (per the Plaintiff), which Plaintiff alleges was essentially retaliatory and improperly took away some of her accommodations. Ruddy Dep. 53:14-15, PageID.2793-94. She felt like she could not ask for any more accommodations even if she needed them. *Id.* at PageID.2794. In February 2018, managers made various comments that she says made

light of her illness. *Id.* at 136:9-15, PageID.2814. She alleges that she asked for multiple meetings with Webster, with manager Jason Yeager, and with OLT CEO Brad Cheedle, to discuss her concerns, but the meetings were consistently postponed or cancelled. *Id.* at 163:19-164:13, PageID.2821; 214:15-24, PageID.2834; 345:20-347:16, PageID.2867.

In addition to these incidents related to her health diagnosis, Ruddy alleges discriminatory treatment based on her gender. She describes a general "men's locker room" culture at OLT. Ruddy Aff. ¶¶ 22-31, ECF No. 42-4, PageID.2965-66. She also makes specific allegations of mistreatment related to her gender: her supervisor Yaeger called her a "glorified door opener" and "dumb," and called her a "dumb bitch" in front of OLT clients; she was called a "dumb blonde" in text messages; a colleague suggested she watch the movie "Glengarry Glen Ross" in what Ruddy saw as an implication she needed to "man up" on the job; colleagues made comments on her appearance and suggested she put a picture in her email signature because she "looked good or pretty and some clients would like that"; during a client presentation, Cheedle told Ruddy to "not talk" and put his hand in her face more than once. Ruddy Aff. ¶¶ 24, 25, 27, 28, 31, PageID.2965-67; Ruddy Dep., PageID.2822-23, 2835. She also alleges that no male employees were ever put on a performance/training plan like she was, and that when she asked questions about the plan or indicated she was uncomfortable with some parts of the plan, she got no response. Ruddy Dep., PageID.2684-85.

In February 2018, OLT was acquired by Schurz Communications. OLT management was asked to eliminate one of three senior positions in Michigan. Mtn. for Summ. J., ECF No. 30, PageID.1190-91. The three individuals whose positions were equivalent and up for termination were Ruddy, Mike Kroon, and John Slack. *Id.* OLT management chose to eliminate Ruddy. They allege that the reasons for her termination were that she had the lowest performance metrics and least seniority of the three candidates for elimination. *Id.* Ruddy alleges that she was terminated because of her illness and because of hostility towards her gender, as the only woman on the sales team. Resp. to Mtn. for Summ. J., ECF No. 42, PageID.2750-51.

Ruddy filed this lawsuit alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws. § 37.1101 (Count I), as well as violations of Title VII, 42 U.S.C. § 2000(e), and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 (Count II). ECF No. 1. At the conclusion of discovery, Defendant filed a Motion for Summary Judgment on all claims. ECF No. 25. Defendant also filed a Motion in Limine to exclude certain evidence related to mitigation and damages. ECF No. 31. Plaintiff filed a Motion to Strike the motion in limine, ECF No. 33, to which Defendant responded with a Motion for Leave to File for Partial Summary Judgment, ECF No. 35.

4

The Court held a hearing on all these motions on October 28, 2020, and also conducted an ultimately unsuccessful settlement conference on December 1, 2020.

## II.   STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); see also Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The trial court is not required to "search the entire record to

establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

### III.   ANALYSIS

Defendant's motion addresses the related, but distinct, grounds on which Plaintiff makes claims under each count. It seeks dismissal in full.

### A. Claims under the federal ADA and the Michigan PWDCRA

Plaintiff claims that OLT violated the ADA and the PWDCRA by "not allowing [her] to work with reasonable accommodations" and "by terminating [her] because of her need for the same." ¶ 26, ECF No. 1, PageID.6. Defendant denies both allegations.

As a general matter, the PWDCRA "substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002) (abrogated on other grounds)). Aside from one issue regarding requests in writing, discussed below, the parties have

not identified any reasons why the Court should treat the claims under the ADA separately from the PWDCRA. The Court's review has also not uncovered any such grounds, and so the claims will be considered together, and the analysis will omit reference to the PWDCRA except as related to that issue. *See, e.g., Morrow v. AI-Cares, LLC*, No. 2:17-CV-10057, 2017 WL 3215206, at *2 (E.D. Mich. July 28, 2017).

### a. Denial of reasonable accommodations

#### i. Legal standard

To show a failure to accommodate under the ADA, Plaintiff must show that: "(1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x. 974, 982-83 (6th Cir. 2011) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)). "Once a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer," in which case it is no longer a reasonable accommodation and the employer is not compelled to offer it. *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018).

To make out a prima facie claim under the PWDCRA, "the plaintiff must show (1) that he is handicapped as defined in the act, (2) that the

7

handicap is unrelated to his ability to perform his job duties, and (3) that he has been discriminated against in one of the ways delineated in the statute," including denial of reasonable accommodations. *Chmielewski v. Xermac, Inc.*, 580 N.W.2d 817, 821 (Mich. 1998). Under the PWDCRA, requests for accommodations are required to be in writing. Mich. Comp. Laws § 37.1210(18).

### ii. Analysis

Defendants do not dispute for the purposes of the motion that Ruddy has Behcet's disease and that it is a qualifying disability, so element (1) of the ADA analysis is not at issue. Mtn. for Summ. J., ECF No. 30, PageID.1214. Parties do not dispute that when Ruddy initially asked for accommodations, they were granted as detailed in the April 2017 letter. Ruddy Dep. 33:4-6, PageID.2789; Statement of Material Facts ¶ 69, ECF No. 30, PageID.1203. This indicates that elements (2) and (3) of the ADA analysis are also not at issue—Ruddy was kept on as qualified for the position with certain accommodations in place.

But Ruddy further alleges that after a certain point, she was denied accommodations. ECF No. 42, PageID.2763-65. Therefore, the Court must determine if there is a genuine issue of material fact as to whether Ruddy made any further accommodation requests and whether those requests were denied. Assuming so, the Court must also evaluate any evidence offered by OLT as to whether any accommodations requested

8

would impose an undue hardship such that they would not be required under the ADA.

The original accommodations letter states that Ruddy's accommodations were to continue until May 15, 2017. She was to keep her supervisor and HR "up to date" on her medical condition and "advise [them] if [she desires] any further accommodation." Def.'s Ex. 2, ECF No. 30-2. The crux of the accommodations issue appears to be whether Ruddy sufficiently advised HR and her supervisor of her continued need for accommodations, and if she did, whether any of her accommodations were not met.

Ruddy concedes that after the initial accommodations plan letter, she made no new written requests for accommodations, or indeed any specific requests that used the word "accommodation." Ruddy Dep. 92:9-93:5, PageID.2803-04. OLT therefore asserts that Ruddy never asked for any accommodations beyond her initial request, meaning there is no genuine issue of material fact as to unmet accommodations.

Ruddy testified during her deposition that she did not ask for "additional accommodation," but her interpretation of the agreement was that the same level of accommodations "would continue further than . . . that date" (i.e., further than May 15, 2017) so long as she kept HR and her supervisor updated about her condition. *Id.* at 38:6-10, PageID.2790. She further stated that "I continued to keep them updated. They continued to be accommodating based off of that. I didn't realize that I

9

had to do anything further." *Id.* at 43:13-17, PageID.2791. She explained in an affidavit that she requested accommodations "of the same types" as those outlined in the letter even after May 15, 2017, and that those requests were granted until about October 2017. Ruddy Aff. ¶¶ 14-17, PageID.2964. Ruddy's understanding that she did continue to "ask" for accommodations is based at least in part on the fact that accommodations continued to be provided. Indeed, her supervisor Jason Yaeger testified to continuing to provide accommodations throughout 2017 and the start of 2018, and that he could not recall ever telling Ruddy that further requests for accommodations needed to be in writing. Yeager Dep. 125:1-16, 127:6-11, ECF No. 42-3, PageID.2919. This testimony raises a genuine issue of material fact as to whether Ruddy did successfully ask for continued accommodations. The Court therefore finds element (4) to be satisfied.

This question must be analyzed slightly differently under the PWDCRA, because the PWDCRA requires requests for accommodations to be made in writing. But Ruddy's original request was made in writing. So the issue of material fact remains, though the specific question for a jury would be whether Ruddy's actions successfully extended the application of her original written request for accommodations in the April 2017 plan (rather than simply if her actions represented an ongoing request for accommodations).

10

Finally, for element (5) Plaintiff must demonstrate a genuine issue of material fact regarding a denial of some accommodation that she requested. The two main accommodations initially offered were time off to attend doctor's appointments, and the ability to attend Monday morning sales meetings from home. Def.'s Ex. 2, ECF No. 30-2. Ruddy concedes that she was provided these accommodations until October 2017. Resp. to Mtn. for Summ. J., ECF No.42, PageID.2742. After that point, she alleges that some of her accommodations were terminated. *Id.*

One specific allegation is that her accommodation to take days off as needed to deal with doctor's appointments was taken away because she had the impression that she was expected to be in the office more regularly. Ruddy Dep. 117:20-25, PageID.2810, PageID.2804. But Ruddy concedes that she was always granted time off to go to the doctor; when she actually asked for it, it was never denied. Ruddy Dep. 49, PageID.2793. Therefore, despite her general allegations, there is no genuine issue of material fact that this accommodation was ever taken away. The record evidence is consistent that it was not.

But the record also contains testimony that Yaeger agreed she did not have to attend Monday morning meetings in person "up until a certain date in which I felt that he kind of stopped doing that." *Id.* at 329:21-22, PageID.2863; *see also* Ruddy Aff. ¶¶ 18-19, PageID.2964-65. Comments were made regarding her sales productivity that Ruddy interpreted to mean she was no longer going to receive accommodations

11

she needed for her disability. ECF No. 42, PageID.2764-65; *infra* Section A(b)(ii). Taking Ruddy's allegations as true at this stage, they raise a genuine issue of material fact as to whether she was denied the accommodation to attend Monday sales meetings from home.[1]

OLT alleges in its motion that driving to meetings is an essential function of Plaintiff's job, presumably to demonstrate that granting her an accommodation to not be present as frequently in person represents an undue hardship. Statement of Material Facts ¶ 3, ECF No. 30, PageID.1190. However, her accommodation to work from home periodically was extended without protest from OLT until at least October 2017. Ruddy Aff. ¶¶ 14-17, PageID.2964. The fact that OLT provided her this accommodation for at least seven months creates an issue of fact as to whether this accommodation is truly a hardship.

The Court therefore denies summary judgment on the question of denial of reasonable accommodations under both the ADA and the PWDCRA. There is a genuine issue of material fact for the jury as to whether Plaintiff's actions constituted a sufficient request for

---

[1] In briefing and at oral argument, Plaintiff's counsel indicated that she also felt the performance plan represented a denial of her accommodations, as it was her understanding that the plan required her to be in the office "4-5 days a week." But the performance plan document itself expressly states that she is required to be in the office "whenever offsite meetings are scheduled OR at least two days per week." ECF No. 30-18. The Court does not find that the performance plan creates an issue of fact regarding denial of accommodations.

accommodations, and there is a subsequent question about one accommodation being denied. Defendant has not carried its burden to show that the accommodation in question represents an undue hardship.

### b. Termination on the basis of disability

#### i. Legal standard

Ruddy also alleges that she was terminated due to her disability. ¶ 22, ECF No. 1, PageID.5. A discriminatory termination under the ADA can be shown through direct or indirect evidence. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891-92 (6th Cir. 2016). There is no direct evidence that she was terminated because of her disability. Therefore, she can only establish a prima facie case of discrimination through the indirect evidence framework, which requires a plaintiff to show "that (1) he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment decision, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Id.*

Once the plaintiff establishes a prima facie case, "the burden shifts to the defendant to "offer a legitimate explanation for its action." . . . If the defendant does so, the burden then shifts back to the plaintiff, who "must introduce evidence showing that the proffered explanation is pretextual."" *Id.* There are at least three ways to show pretext: "the

plaintiff may show that (1) the employer's stated reasons for terminating the employee have no basis in fact, (2) the reasons offered for terminating the employee were not the actual reason for the termination, or (3) the reasons offered were insufficient to explain the employer's action." *Gunn v. Senior Servs. of N. Kentucky*, 632 F. App'x 839, 844 (6th Cir. 2015). "To demonstrate pretext, a plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015).

This three-part burden-shifting analysis is also known as the *McDonnell-Douglas* framework. *Id.*; *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). This three-part analysis is also used to evaluate claims under the PWDCRA. *Mazur v. Wal-Mart Stores, Inc.*, 250 F. App'x 120, 124 (6th Cir. 2007).

### ii. Analysis

To start, Ruddy has introduced sufficient facts to establish a prima facie case of discrimination:

(1)    She has Behcet's disease, a qualifying disability;

(2)    She was otherwise qualified for her position;

(3)    She was terminated;

(4)    OLT was aware of her disability and had previously provided accommodations for it; and

14

(5)     OLT hired two salespersons after Plaintiff was let go, and she alleges that she was replaced by them.[2]

Ruddy Dep. 182:8-13, PageID.2826.

The burden then shifts to Defendant. OLT offers two non-discriminatory rationales for her termination. The first is that they were engaged in restructuring after being bought by Schurz and were instructed to eliminate one sales position and reallocate the resources of that position to new roles. Mtn. for Summ. J., ECF No. 30, PageID.1190-91. Yaeger testified that he was told the company's new investors wanted to "move from a more regional-based sales approach to a more national-based sales approach" and that they needed to "free up some dollars to invest in that strategy." Yaeger Dep. 146:1-13, PageID.2925, 2935-38. The second is closely related to the first: based on her various performance and sales metrics, OLT alleges that the decision to

---

[2] Defendants take particular issue with this part of the analysis, arguing for various reasons that there is no genuine issue of material fact as to whether Ruddy was "replaced," and that in fact her position was eliminated. ECF No. 30, PageID.1194-95. The record indicates that after she was let go, the first two salespeople hired were charged with making cold calls (Yaeger Dep. 147:3-8, PageID.2925), work that was related to, if not exactly the same as, what Plaintiff had been doing. Additionally, the two men were doing work that Plaintiff alleges she was amply qualified to do, given that she had more experience than either of them. Ruddy Aff. ¶ 8, PageID.2963. Drawing a reasonable inference in Ruddy's favor, a juror could conclude based on this record that that Plaintiff was replaced by the two new salesmen. The Court is satisfied that there is a genuine issue of material fact on this point.

terminate Ruddy was taken because she was the lowest performer and had the least seniority of the three individuals in her position. ECF No. 30, PageID.1190-93.

The burden then shifts back to Plaintiff, and the Court must consider whether she has introduced sufficient evidence to create a genuine issue of material fact as to whether OLT's provided explanations are pretextual. She testifies she was told during her termination meeting that OLT had decided "to terminate her position as we are expanding to new territories . . . we'll be using your salary to expand outside of Michigan and our current territories." Ruddy Dep. 257:16-22, PageID.2845. This matches what Cheedle, Webster, and Yaeger testify to regarding the reason for her termination. Cheedle Dep. 29:25, ECF No. 30-6, PageID.1350-52 (indicating that this was "not a termination for performance"); Webster Aff. ¶¶ 7-8, ECF No. 30-7, PageID.1368; Yaeger Aff. ¶ 5, ECF No. 30-5, PageID.1328. OTL never represented that the purpose of restructuring was to allocate the dollars to a particular kind of candidate; rather, the purpose was to allocate the dollars being spent on her position to "promote sales in other markets." Yeager Aff. ¶ 5, PageID.1328. Cheedle testifies to the fact that the newly hired individual did engage in sales calls in parts of the country different from those where Ruddy did. Cheedle Dep., PageID.1359-64.

But Ruddy says that this is a pretextual explanation because the individuals hired did not have national sales experience. Ruddy Aff. ¶ 8,

16

PageID.2963. Additionally, both of the individuals hired were men, and their combined salaries represented *more* money than Ruddy's salary. Yaeger Dep., PageID.2925-26. These facts are sufficient to raise a question as to whether the stated business reason for her termination was pretextual.

Ruddy also alleges that OLT's extensive references to her poor performance are pretextual because her poor performance was not presented as a reason for her discharge and was never "raised as an issue" until after litigation commenced. Resp. to Mtn. for Summ. J., ECF No. 42, PageID.2767-68. In fact, she was told during her termination meeting that she had "done well." Ruddy Dep. 348:6-9, PageID.2867. "Shifting justifications over time" can be evidence of pretext. *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). OLT offers substantial evidence that her performance, particularly in comparison to the other two senior sales individuals in Michigan, was the reason she was chosen for discharge, even if it was not discussed with her during her termination meeting. Statement of Material Facts ¶¶ 7-14, ECF No. 30, PageID.1191-92. But again, the existence of competing evidence at this stage merely means that there is a question of material fact, and that summary judgment is inappropriate.[3]

---

[3] In its briefing and at oral argument, Defendant cited *Miles v. South Central Human Resource Agency, Inc.* to argue that its business justification for the termination cannot be challenged because Ruddy does not offer any evidence that the cited metrics regarding her

In addition to this evidence suggesting that the offered explanations were *not* the real reason for her termination, Ruddy also provides facts that could suggest her illness *was* the real reason for her termination, as is necessary to show pretext. She provides testimony about commentary that was made over the course of her employment regarding her illness: that her illness was "behind [her]" and that she needed to improve her performance, Ruddy Dep. 339:15, PageID.2865; hearing "[h]ey, you're not sick anymore" from a colleague, *id.* at 342:25, PageID.2866; Yaeger saying she was now "on a level playing field" with other salespeople, Yaeger Dep. 131:12-15, PageID.2920.

Given these comments and her perception of a change in how OLT was handling her accommodations (discussed above in Section III(A)(a)), there are enough facts for a reasonable jury to find that Plaintiff's disability was the reason for her discharge. Therefore, summary judgment on the claim of improper termination under the ADA and the PWDCRA is denied.

---

performance as an employee are inaccurate. 946 F.3d 883, 888-89 (6th Cir. 2020) ("For a plaintiff's challenge to the factual basis of an employer's proffered termination rationale to establish pretext, the plaintiff must provide evidence that the employer's allegations never happened."). But Ruddy is not challenging the factual basis of OLT's termination rationale. Defendant's reading of *Miles* is too narrow and ignores the fact that "shifting justifications" can be an independent basis for showing pretext. *Id.* at 890.

### B. Claims under Title VII

Ruddy claims that she was improperly terminated on the basis of her gender, and that she suffered three other specific violations of Title VII. Like discrimination claims under the ADA, gender discrimination under Title VII can be shown through direct or indirect evidence. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012). Ruddy does not allege any direct evidence of discrimination, so the Court will proceed with a circumstantial evidence framework on each claim.

Another threshold question for Title VII claims is whether they are brought under a mixed-motive or single-motive theory, because the analytical framework is different for each. A plaintiff must give notice that their claim is mixed-motive, either explicitly by naming it or implicitly by using the mixed-motive "motivating factor" test in their briefing. *Id.* Ruddy has done neither, so the Court will proceed on the understanding that she is bringing single-motive Title VII claims. *See, e.g.*, *Hashem-Younes v. Danou Enterprises Inc.*, 311 F. App'x 777, 779 (6th Cir. 2009) ("The record is utterly silent as to mixed motives. . . . Therefore, the district court did not err in applying the *McDonnell Douglas/Burdine* framework, instead of mixed-motives analysis[.]").

### a. Termination on the basis of gender

#### i. Legal standard

For a termination claim under Title VII, a prima facie case of discrimination by Ruddy requires that "(1) she is a member of a protected

group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008). The *McDonnell-Douglas* framework again applies—if Ruddy can establish a prima facie case of gender discrimination, OLT can offer legitimate, nondiscriminatory reasons for its actions that led to an adverse employment decision, and Ruddy can offer facts in return that show pretext. *Id.*

### ii. Analysis

This analysis largely mirrors that of Ruddy's claims that she was terminated on the basis of her disability. Under Title VII, she alleges that she suffered discrimination because she was terminated on the basis of her gender. Regarding a prima facie case of discrimination, factors (1) and (3) are not in dispute. Termination is a "classic example of adverse employment action" for the purposes of factor (2). *Grace*, 521 F.3d at 677. The Court has already concluded that Ruddy sufficiently alleges that she was replaced—in this case, by two male employees, who are outside the protected class. *See supra* Section III(A)(b)(ii). Therefore, Ruddy successfully alleges a prima facie case of gender discrimination.

OLT offers the same non-discriminatory rationale for her discrimination, that it was a business restructuring and that she was the lowest performer of the three employees eligible for termination. *Id.*

Ruddy points to the same shifting rationales for her termination—what was first presented to her as a business decision is now characterized as being about her poor performance—as evidence of pretext. *Id.*

She also offers facts about her experience at OLT specifically related to gender discrimination: the general "men's locker room" culture, Ruddy Aff. ¶ 22, PageID.2965-66; comments from supervisors including "glorified door opener," "dumb bitch," and "dumb blonde"; a suggestion to watch the movie "Glengarry Glen Ross" in what Ruddy saw as an implication she needed to "man up" on the job; and comments on her appearance and the suggestion that she put a picture in her email signature because she "looked good or pretty and some clients would like that." Ruddy Aff. ¶¶ 24, 25, 27, 28, 31, PageID.2965-67; Ruddy Dep., PageID.2822-23, 2835. Taken together with the shifting rationales offered for her termination, these incidents are sufficient to allege pretext and create a genuine issue of material fact as to whether Ruddy was terminated because of her gender. Therefore, summary judgment as to this claim must be denied.

### b. "Improper discipline" or retaliation

#### i. Legal standard

Ruddy also alleges that OLT violated Title VII by "improperly disciplining" her. Compl., ECF No. 1, PageID.7. Based on her Response brief, the Court understands this to be a retaliation claim. ECF No. 42, PageID.2742, 2752, 2757, 2771. A retaliation claim requires Plaintiff to

show that: "(1) she engaged in a protected activity; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 568 (6th Cir. 2019) (quoting *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018)). The *McDonnell-Douglas* framework again applies. *Id.*

The standard for what a "materially adverse action" is in the retaliation context is fact-specific: "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Rogers*, 897 F.3d at 776 (6th Cir. 2018) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

### ii. Analysis

The main claim of retaliation that Ruddy seems to be making concerns her "training" or "performance" plan (ECF No. 30-18)—Ruddy alleges that she was put on the plan in retaliation for speaking with HR about the gender-based comments that Yaeger made towards her in August 2017. Ruddy Dep. 163:19-165:6, PageID.2821-22; Ruddy Aff. ¶ 19, PageID.2965. As evidence of discrimination, she further alleges that no male sales employee was ever put on such a plan. ECF No. 42,

22

PageID.2770-71; Ruddy Dep., PageID.2864. Her supervisor Yaeger agrees that no male salesperson was given a training plan in 2017 or 2018. Yaeger Dep. 220:4-14, PageID.2943.

However, Ruddy does not allege facts to indicate that this plan would have "dissuaded a reasonable worker" from making a charge of discrimination, such that it could be found to be a "materially adverse" action. She states that she felt "tricked" by the performance plan, but subsequently sent an email to Yeager expressing her concerns about it, indicating that she was willing to state publicly that she thought it was discriminatory and ask for redress. Ruddy Dep. 335:15-19, PageID.2864. Therefore, in this case it seems that the challenged action did not "dissuade" her from making a charge of discrimination, at least internally. Although this is a fact-specific inquiry, courts in our Circuit have concluded that performance improvement plans on their own generally do *not* constitute adverse employment actions in the retaliation context. *Allen v. Ohio Dep't of Job & Family Servs.*, 697 F. Supp. 2d 854, 891 (S.D. Ohio 2010); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (finding 90-day performance plan together with placement on paid administrative leave to qualify as an adverse action); *Bacon v. Honda of Am. Mfg., Inc.*, 192 F. App'x 337, 343 (6th Cir. 2006).

On this record then, the Court finds it unnecessary to determine whether the other elements of a prima facie retaliation claim can be met, or to engage in the *McDonnell-Douglas* analysis—Plaintiff cannot point

to any other "materially adverse" action that arose out of alleged retaliation. Summary judgment is therefore appropriate on this claim.

### c. Hostile work environment

#### i. Legal standard

Ruddy next alleges that throughout her time at OLT she was subjected to a hostile work environment where disparaging comments were made about her gender, with no resolution even after she reported the comments. Resp. to Mtn. for Summ. J., ECF No. 42, PageID.2776. To establish a prima facie case for a hostile work environment due to gender, a plaintiff must show: "1) she is a member of a protected class; (2) she was subjected to unwelcome . . . gender harassment; (3) the harassment was based the employee's protected status . . .; (4) the harassment unreasonably interfered with work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable." *Lamanna v. Dayton Police Dep't*, 788 F. App'x 1003, 1008-09 (6th Cir. 2019).

""Hostile work environment" is a term of art, which refers to an unlawful employment practice under Title VII that arises because of "discriminatory intimidation, ridicule, and insult[s]" repeatedly directed at an employee on the basis of a protected characteristic." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015). Courts should consider all of the circumstances surrounding conduct in determining whether it creates a hostile work environment, and a finding

can be based on the accumulation of a number of separate incidents. *See generally Minevich v. Spectrum Health-Meier Heart Ctr.*, 1 F. Supp. 3d 790, 800 (W.D. Mich. 2014). The Sixth Circuit has found a hostile work environment in cases of overtly sexual comments and aggressive touching, stalking, and backlash for filing a harassment complaint. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351-52 (6th Cir. 2005). By contrast, "the "sporadic use of abusive language, gender-related jokes, and occasional teasing" are not sufficient to establish liability." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

### ii. Analysis

The Court has already summarized the comments Ruddy was subjected to in the workplace that she alleges were related to her gender. *See supra* Section III(B)(a)(ii). OLT does not deny that these comments were made; rather, it argues that these comments are not in and of themselves indicative of gender-based animus. Mtn. for Summ. J., ECF No. 30, PageID.1200-02.

There is no doubt that these comments are inappropriate, objectionable, and sexist. However, these allegations are much more like the "sporadic" comments described in the caselaw. *See Clark*, 400 F.3d at 351-52 (collecting cases; finding that "three relatively isolated incidents" of sexual harassment in combination with "vulgar jokes" made at least once a month do not make out a prima facie case of a hostile work environment and differentiating from a co-plaintiff who experienced "an

25

ongoing pattern of unwanted conduct and attention"). Given the high standard in the Sixth Circuit, the Court finds no genuine issue of material fact as to whether this conduct rose to the level required for liability on a hostile work environment claim.

### d. Gender discrimination regarding the terms and conditions of employment

#### i. Legal standard

Discrimination in terms and conditions of employment is generally analyzed under the retaliation or hostile work environment frameworks, depending on the factual circumstances surrounding the discrimination alleged. *Compare Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 471 (6th Cir. 2012) (retaliation claim), *with Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017) (hostile work environment claim). Here, Ruddy does not allege a temporal connection between a protected activity and subsequent discrimination in the terms and conditions of employment. Therefore, the Court will analyze this claim under the hostile work environment framework, understanding Ruddy's claims to mean that she was generally subjected to this discrimination during her time at OLT.

#### ii. Analysis

Ruddy makes two main allegations regarding gender discrimination in the terms and conditions of her employment. The first centers on the "spiffs", or commission increases—she alleges the spiffs offered to her on certain deals were discriminatorily low. Resp. to Mtn.

for Summ. J., ECF No. 42, Page.ID.2750. Ruddy provides specific evidence related to one particular deal. There, she states she received a $3,000 spiff while colleague John Slack received a $10,000 spiff. *Id*. However, OLT provided an affidavit from its VP of Finance, Kathy Fox, indicating that Ruddy's understanding of the spiff offered is mistaken, and that she actually received a larger spiff on this deal than John Slack did. Fox Aff. ¶¶ 3-4, ECF No. 30-29, PageID.1507. Ruddy otherwise makes a general allegation that spiffs for "certain deals and the way certain deals were structured" were discriminatory. Resp. to Mtn. for Summ. J., ECF No. 42, Page.ID.2831. However, the Fox Affidavit explains the spiff structure in detail and states that Ruddy never received lesser payments than male salespersons for similar transactions. Fox Aff. ¶ 3, 7, PageID.1507-08. Contrasting Ruddy's general allegations with the Fox Affidavit's specific explanations, the facts do not bear out her side of the story, even taken in the light most favorable to her. The Court finds there is no remaining question of material fact as to whether Ruddy experienced gender discrimination related to spiffs.

She also alleges that she was not allowed to attend conferences with the same leeway that male salespeople were. Counter-Statement of Material Facts ¶¶ 49-51, ECF No. 42, PageID.2751. She indicates that when she asked for input or permission on attending conferences, Yaeger was inconsistent in his replies to her. Ruddy Dep. 206:13-15, PageID.2832. Meanwhile, she alleges that male salespeople attended

several conferences, though she does not ever allege that male salespeople got responses where she did not. *Id.* at 205:3-9. There is very little specific evidence in the record on any of these claims, however, and no evidence beyond Ruddy's bare allegations that any differential treatment regarding permission to go to conferences was specifically related to her gender. The Court does not find that she has successfully alleged facts sufficient to show differential treatment regarding conference attendance based on her gender.

Because Ruddy has failed to establish element (2) of the prima facie case of a hostile work environment in both of these situations, summary judgment is granted as to claims of gender discrimination in the terms and conditions of her employment.

## C. Claims under the ELCRA

Ruddy alleges the same four claims of gender discrimination under the ELCRA as under Title VII. ¶ 31, ECF No.1, PageID.7. "Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007) (citing *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir.2004)). Although the analysis of certain claims can vary slightly between the two statutes, the parties have not identified, and the Court has not located, any differences relevant to the claims Ruddy raises. Therefore, summary judgment on her ELCRA claims is similarly denied as to termination on the basis of gender, but granted as to improper

28

discipline, a hostile work environment, and gender discrimination regarding the terms and conditions of employment.

## D. Defendant's Motion in Limine and related motions

Lastly, the Court will consider OLT's Motion in Limine to limit damages based on Ruddy's alleged failure to mitigate and based on after-acquired evidence. ECF No. 31. This motion resulted in significant follow-on motions practice, including a Motion to Strike filed by Plaintiff (ECF No. 33) and a partial Motion for Summary Judgment with the same claims as the Motion in Limine (ECF No. 35).

OLT cites two examples of cases in this district where a motion in limine was filed to address mitigation and after-acquired evidence. In the first, Judge Borman allowed a party to amend their Answer to include affirmative defenses related to mitigation, given some discovery issues peculiar to the case at hand and a change in counsel partway through the litigation. *Nemeth v. Citizens Fin. Grp.*, No. 08-CV-15326, 2012 WL 3262876 (E.D. Mich. Aug. 9, 2012). In the second, Judge Rosen granted a motion in limine to foreclose the award of front pay damages, interpreting a specific Supreme Court ruling relevant to the facts of the case. *Ritten v. Lapeer Reg'l Med. Ctr.*, No. 07-10265, 2010 WL 374163 (E.D. Mich. Jan. 25, 2010). Both cases involved motions filed after summary judgment motions had been ruled on, but before trial. Ruddy's main argument in opposition is that this motion is in essence a motion for partial summary judgment, because it asks the Court to completely

dispose of certain claims related to damages. Mtn. to Strike, ECF No. 33, PageID.2072.

The Court is persuaded by the approach of Judge Lawson, who declined to grant a motion in limine (again, after summary judgment but before trial) on the issue of mitigation of damages. *Figgins v. Advance Am. Cash Advance Centers of Michigan, Inc.*, 482 F. Supp. 2d 861, 871 (E.D. Mich. 2007) ("The defendants argue that the plaintiff did not mitigate her damages and therefore should be prevented from recovering back pay after September 2005. The plaintiff responds that it is for the jury to decide whether she has mitigated her damages or not as far as back or front pay go. . . . [A]ny argument . . . about the facts of mitigation should have been brought in the summary judgment motion. There appears to be a fact dispute on the mitigation issue. This part of the motion will be denied."). Issues of failure to mitigate and other after-acquired evidence are largely related to damages, and as such will be properly before the jury assuming the parties go to trial. The Court does not find the posture of this case to be similar to *Nemeth* or *Ritten* such that some extraordinary reason justifies addressing these issues now.

To the extent that any of these issues could have been included in a motion for summary judgment, Defendants had that opportunity and did not avail themselves of it. The issues have been thoroughly briefed and the Court declines to allow a second partial motion for summary judgment. E. D. Mich. LR 7.1(b)(2).

## CONCLUSION

For all the reasons set out above, OLT's Motion for Summary Judgment (ECF No. 30) is **GRANTED IN PART** and **DENIED IN PART.** Specifically, summary judgment on Count I is **DENIED**. Summary judgment on Count II under both Title VII and ELCRA is **DENIED** as to termination on the basis of gender, but is **GRANTED** for claims relating to improper discipline, a hostile work environment, and gender discrimination regarding the terms and conditions of employment.

Additionally, Defendant's Motion in Limine (ECF No. 31) is **DENIED WITHOUT PREJUDICE**, and its Motion for Leave to File for Partial Summary Judgment (ECF No. 35) is **DENIED WITH PREJUDICE**. Plaintiff's Motion to Strike (ECF No. 33) is **DENIED** as moot.

**SO ORDERED**, this 3rd day of March, 2021.

BY THE COURT:

s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

31